UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SHEYNA DOUPREA,

          Petitioner,

    v.

DEBORAH K. JOHNSON,

          Respondent.

Case No. 15-cv-06133-JST

**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS; DENYING CERTIFICATE OF APPEALABILITY**

Before the Court is the above-titled petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254 by Petitioner Sheyna Douprea, challenging the validity of her state court conviction. ECF No. 12. Respondent has filed an answer to the petition, ECF No. 20, and Petitioner has filed a traverse, ECF No. 31. For the reasons set forth below, the petition is denied.

## I. PROCEDURAL HISTORY

On August 16, 2010, a Sonoma County jury found Petitioner guilty of first-degree murder, enhanced for use of a knife. Clerk's Transcript[1] ("CT") 312–13; Reporter's Transcript[2] ("RT") 2681–83. On January 4, 2011, the trial court sentenced Petitioner to twenty-six years to life in prison. CT 2586; RT 2924–28.

On November 30, 2012, the California Court of Appeal affirmed the judgment in an unpublished decision. People v. Douprea, No. A131031, 2012 WL 5987896, at *1 (Cal. Ct. App. Nov. 30, 2012). On March 13, 2013, the California Supreme Court denied review. ECF No. 24-4 at 2.

On May 15, 2014, Petitioner filed a petition for a writ of habeas corpus in the California

_____

[1] The Clerk's Transcript is docketed at ECF Nos. 21–22.
[2] The Reporter's Transcript is docketed at ECF No. 23.

Supreme Court. ECF Nos. 24-5–24-18. After soliciting an informal opposition from respondent, the California Supreme Court denied the petition on December 16, 2015.

On December 28, 2015, Petitioner filed a federal habeas petition that commenced this action. See ECF No. 1. On January 10, 2017, Petitioner filed an amended habeas petition that omitted her unexhausted claims. See ECF No. 12 ("Pet.").

## II. FACTUAL BACKGROUND

The following factual and procedural background is taken from the California Court of Appeal's opinion:[3]

> Sheyna Douprea, then 23 years old, stabbed her intoxicated 46–year–old boyfriend to death after he refused to go with her to a Christmas party in December 2008. The essential question at trial was Douprea's state of mind at the time of the killing.
>
> A. *Pretrial and Evidentiary Rulings*
>
> An information charged Douprea with the murder of her boyfriend, Daniel Mooney, and alleged that she perpetrated the murder willfully, deliberately, and with premeditation. (Pen. Code, § 187.) The information further alleged that Douprea personally used a deadly and dangerous weapon (a knife), such that the offense was a serious felony. (Pen. Code, §§ 12022, subd. (b)(1); 1192.7, subd. (c)(23).) In addition, it was alleged that Douprea personally and intentionally inflicted great bodily injury. (Pen. Code, §§ 1203.075, 12022.7, subd. (a)).
>
> In July 2010, the prosecution filed motions in limine seeking admission of numerous prior acts of violence by Douprea. (Evid. Code, §§ 1101, subd. (b); 1109.) Defense counsel opposed the motions in part. The trial court admitted all but two of the prior incidents, a ruling that Douprea challenges in this appeal, as discussed *post*.
>
> Also in July 2010, defense counsel agreed with the prosecutor's motion to preclude a defense expert witness from opining that Douprea suffers from Battered Women's Syndrome (or, as it is also known, "Intimate Partner Violence"). (See Evid. Code., § 1107.) The court later precluded the expert's opinion that Douprea entered into a dissociative state on the date of the crime. As addressed *post,* Douprea challenges these matters as well.
>
> B. *Prosecution Case*
>
> 1. *Relationship Between Douprea and Mooney*
>
> Douprea and Mooney started dating in late 2007 or early 2008. At that time, Mooney lived in an apartment in Healdsburg with Matthew Schamens, whom he

---

[3] The Court has independently reviewed the record as required by AEDPA. Nasby v. Daniel, 853 F.3d 1049, 1052–54 (9th Cir. 2017). Based on the Court's independent review, the Court finds that it can reasonably conclude that the state court's summary of facts is supported by the record, unless otherwise indicated in this order.

2

had met at an alcohol rehabilitation center. Douprea lived with her two-year-old daughter in Windsor, in a mobile home purchased by her mother, Gena. [FN 1]

> FN 1: Because Gena Douprea has the same last name as appellant, we refer to Gena by her first name for clarity, without disrespect.

In August 2008, about four months before the killing, Douprea and Mooney had a physical altercation witnessed by Douprea's neighbor, Jennifer Cardona. Cardona testified that she saw a female quickly leaving Douprea's home around midnight, trying to get away from a male and yelling at him to "leave us alone." The man pulled the woman by the hair toward the house and then toward a car; she pushed him to get away; and then he hit her and she fell to the ground. Cordona called 911, and the police soon arrived.

Questioned by the police, Mooney denied hitting Douprea or any physical violence, while Douprea claimed they had a fight because she wanted him to spend the night. Photographs admitted at trial showed an injury to Douprea's hip and a small scratch on her face. After Mooney was taken away, however, Douprea asked the police how she could bail him out. She did not want him arrested and did not want a restraining order.

At some point, Mooney obtained a restraining order against Douprea. Sometime thereafter, Schamens observed an argument between them at Mooney's apartment: Douprea struck at Mooney's face, removed Mooney's glasses and threw them on the floor, and hit Mooney with a towel rack; Mooney had scratches down his neck and "claw" marks on his chest.

In November 2008, Mooney started drinking again. Schamens saw Mooney intoxicated twice, but on neither occasion was he aggressive or violent. Schamens vacated the apartment in late November, and Douprea accepted Mooney's invitation to move in.

Around 11:00 p.m. on the night before the December 14 killing, Victoria Steel, who lived in the apartment below Mooney's, heard noises upstairs for 15–20 minutes. The noises sounded like something heavy dropping on the floor. [FN 2]

> FN 2: As described *post,* Douprea told the police that she had an argument with Mooney the night before he died; initially, she claimed there was no violence; later she asserted that he had swung at her, choked her, threatened to kill her, and twisted her arm behind her back.

## 2. *The Hours Before the Killing*

On the morning of December 14, 2008, Douprea attended church and dropped off her daughter at daycare. At 11:00 a.m., she picked up her daughter and said she was going to a Christmas party. She did not appear distraught.

Around 11:15 or 11:30 a.m., Douprea was observed driving in the direction of Gena's home in Windsor. Gena confirmed that Douprea dropped off her daughter at her house around 11:30 a.m. and was in a pleasant mood.

According to Douprea's cell phone records, Douprea called Nicole Rowan, her sponsor at Alcoholics Anonymous, at 11:31 a.m. and spoke for nine minutes. Rowan testified that Douprea sounded irritated; she had planned to go to a Christmas party with Mooney and he was already drinking at 11:00. The last thing Douprea said was, "I'm going to go and get him cleaned up, see if I can get him

cleaned up."

At 11:54 a.m., Douprea called Gena and spoke with her for eight minutes. According to Gena, Douprea said she was locked in the bathroom and Mooney had beaten her, threatened to kill her, and tried to strangle her. Gena heard screaming and pounding on the door, and Douprea sounded terrified and frantic and was "sort of" crying. Douprea said she did not know what to do; she could not leave the apartment, and she did not want to call 911 because she was afraid Mooney would go to jail. After about six minutes, the pounding and screaming subsided, Douprea seemed calmer, and she said she thought everything was going to be alright. Douprea convinced Gena not to call 911.

According to Douprea's cell phone records, Douprea spoke next to her friend Fulton, from 12:04 to 12:09 p.m. Fulton testified that he had invited Douprea and Mooney to dinner and called Douprea to let her know she did not have to pick up one of the other guests. Although she seemed calm, Douprea told him that Mooney had been drinking and they got into an altercation. At Fulton's request, Douprea put Mooney on the phone; obviously intoxicated, Mooney's speech was so slurred that Fulton could hardly understand him. After Mooney got off the phone, Fulton spoke to Douprea while Mooney was "laughing maniacally" in the background. Douprea said, "Get off of me, Daniel" at least once, but still seemed calm. According to Fulton, Mooney's laugh sounded evil and out of control; he testified that he had never heard Mooney laugh that way before. Douprea said she was scared (or sounded scared) when she talked about Mooney being physical with her, and she asked Fulton if she should call the police. Fulton suggested that Douprea leave the apartment and talk to Mooney when he was sober.

Janet Lopez and Tamara Nolan, who lived in the apartment next to Mooney's, testified that they were returning to their apartment around 12:15 or 12:30 p.m. on December 14th when they met Douprea going up the stairs. [FN 3] Douprea was talking on her cell phone, saying "I will get him up or get him out." She did not appear angry.

> FN 3: Their time estimate may not be correct, since Douprea's cell phone records indicate that Douprea was on the phone with Fulton from 12:04 to 12:09 p.m. and made calls to Gena at 12:09 p.m., to 911 (apparently without a connection) at 12:29 p.m., and to Gena at 12:33 p.m.

At some point between 12:09 and 12:32, Douprea killed Mooney.

### 3. *Douprea's Post–Killing Call to Gena; Gena's Call to 911*

At 12:33 p.m., Gena received a call from Douprea. Crying and very upset, Douprea said Mooney had been strangling her and tried to kill her, and she stabbed him. Douprea claimed she had tried to call 911 but could not get through. Gena said she would call 911 and hung up.

Gena testified that she called 911 when she got off the phone with Douprea and gave the dispatcher Douprea's contact information. She also told the 911 operator that there was probably a knife in the house and that Douprea "[said] he's dead." Police dispatcher Linda Haviland testified that Gena called 911 at 12:32 p.m. [FN 4]

> FN 4: It is unclear why records indicate that Douprea's call to Gena was at 12:33 p.m., while Gena's call to 911, supposedly following Douprea's call to Gena, was at 12:32 p.m.

4

### 4. *Police Dispatch and Douprea's False Statement to the Dispatcher*

The Healdsburg Police were dispatched to Mooney's apartment at 12:33 p.m., and officers arrived at 12:34. Before they entered, Haviland telephoned Douprea inside the apartment. In a tape of the conversation played for the jury, Douprea told Haviland, "I came in from church and my boyfriend's covered in blood." (At trial, defense counsel conceded that Douprea's statement to the dispatcher was untrue.)

### 5. *The Crime Scene*

At 12:39 p.m., the police entered Mooney's apartment. Mooney was on his back on the floor of his bedroom, unresponsive, attempting to breathe, and bleeding heavily. A towel saturated with blood was against the left side of his neck. A lot of blood was on the floor around him, particularly close to his head. Emergency medical technicians were unable to revive him; he was transported to the hospital and pronounced dead on arrival.

Douprea was handcuffed and remained with police inside the apartment for 15 to 20 minutes. She had blood on her lip and in her left nostril. She was concerned about Mooney, seemed to be crying, and was breathing heavily or rapidly, but she had no difficulty speaking and did not indicate she was in pain.

A police officer drove Douprea from Mooney's apartment to the Healdsburg police station. Douprea had no difficulty breathing or speaking, she did not cough or gasp, and nothing about her appearance suggested she needed medical attention.

### 6. *Mooney's Condition*

Mooney had a .35 percent blood alcohol level and a therapeutic level of Benadryl in his blood, which in combination would intoxicate a person much more than either substance would separately. He was 70 inches tall and "relatively slight" and "slighter framed," weighing 150 pounds.

An autopsy determined that Mooney died from four stab wounds on the left side of his neck. Three of the wounds had the same angle, suggesting they occurred in the same session, while Douprea and Mooney were in the same relative positions. The pathologist could not determine, however, the position of Mooney or Douprea at the time of the injuries. Two of the wounds were about one and a half inches deep, reflected similar paths through the neck and external jugular vein, damaged the internal jugular vein and carotid artery, and would have been fatal individually. A third wound was about one and a quarter inches deep, just below the left jaw bone. The fourth wound was toward the back of the left side of Mooney's neck and about a half inch deep. Mooney had superficial wounds around his left nostril, on his left forearm, and on his right palm, which could have been caused by a fingernail or a knife. He had abrasions on the left side of his face and the right side of his neck, along with apparent scrapes from fingernails on his arm and bruises on his nose and above his right eyebrow.

### 7. *Physical Evidence*

The knife that Douprea used to kill Mooney was a folding pocketknife with a two-inch blade. Police found it in a diaper pail on the patio, under soiled diapers.

The room with the most blood was a bedroom in which Mooney's wallet was found. Blood was on the bed and saturated the carpet. There was also blood

leading to the bathroom and inside the bathroom. Blood in the shower suggested that someone had taken a shower (and Douprea's hair was wet when the police arrived).

In the kitchen, blood was on the counter, in the sink, on the refrigerator, and next to the sliding glass door. In the trash can was broken glass wrapped in a wet tissue, a shoe with apparent blood stains, and paper towels soaked in blood.

### 8. *Douprea's Statement to Police*

Douprea was interviewed at the police station by Healdsburg Police Detective Shooter for about three hours, starting around 3:00 p.m. The interview was recorded. Other than a headache, Douprea made no complaints of pain. She had a one-inch red mark above her brow and said she had suffered a nose bleed.

Douprea offered police several inconsistent explanations for Mooney's death. She began by saying that she just found Mooney on his bed, bleeding, when she came home. She tried to help him to the bathroom so she could put a towel on his neck, but he slumped to the floor. She tried to call 911 but could not get through, so she called Gena and said Mooney might be dying.

Douprea next told police that Mooney had been getting drunk lately and was prone to fighting when drunk. Douprea described previous altercations between them, including one the night before. [FN 5] This time, Douprea claimed, Mooney attacked her by pulling her into the closet, beating her, twisting her arm, and asking her if she wanted to die. She fought back, and he "started bleeding more" from what "might have been some kind of a cut."

> FN 5: Douprea told the police that Mooney had assaulted her physically two or three times before the day she killed him. The first time was the August 2008 incident at her home; she claimed that Mooney choked her and said, "I'm gonna kill you." Douprea also stated that she would bite Mooney to get him off of her, and she had a recorded voice message from Mooney saying he would rearrange her face if she ever bit him again. As to the night before the killing, Douprea first told the police they had a non-violent argument in which he did not understand why she wanted to be with him since he was a worthless drunk. Later she claimed that he became angry when she asked him how much he had to drink, and he swung at her and choked her. Holding her throat, he pressed her up against the refrigerator, told her not to get into his business, and said he was going to kill her. Later that night, he twisted her arm behind her back and said she was worthless and drove him to drink.

Detective Shooter told Douprea that her story was not "lining up." Douprea then claimed that Mooney was choking her, so she used a pocket knife to try to get him off of her and accidentally cut his neck. Eventually, Douprea provided additional details, which we piece together as follows.

On the morning of the killing, Douprea went to church with her daughter, dropped her off afterward at Gena's home in Windsor, and returned to Mooney's apartment so she and Mooney could attend a Christmas party. But when she went into Mooney's bedroom, he rolled away from her and said they were not going. She replied that the party was very important to her, but Mooney repeated they were not going. "[V]ery hurt," Douprea pulled back Mooney's blanket and said, "Come on, you gotta get ready, let's go."

Mooney became very angry and followed her into the kitchen. They punched each other in the nose, and they each had bloody noses. They gave each other a black eye. He banged her head on the floor, twisted her arms, and threatened to break them.

Douprea ran into the bathroom and called Fulton and Gena, telling them she was scared. She did not call the police or ask anyone to do so because Mooney was on parole and would get into trouble. She loved him and knew that "that's not the sober him."

Douprea next went into her bedroom. After about a minute and a half, Mooney opened the door, yelled at her, and insulted her. When he left, she thought about what to do. She felt unsafe because the door to her room did not lock, but she felt unable to leave the apartment because her experience was that he would become more angry and something worse would happen. [FN 6]

> FN 6: When Detective Shooter asked Douprea why she stayed in the apartment to confront a belligerent and violent man, she said she could usually calm Mooney down, she loved him, and she did not want to get him in trouble.

So Douprea got her knife and put it in her pocket. After about 10 minutes in her bedroom, she went to the bathroom for a few minutes until she said to herself, "Okay, I'm calmed down, I'm gonna go talk to him."

Douprea went to Mooney's bedroom to calm him down, as she was usually able to do. She brought her knife along to protect herself and to scare him, because she thought there could be a fight.

Entering Mooney's room, Douprea tried to reassure Mooney, saying she did not want to fight, she loved him, and everything would be okay. She went to hug him, but Mooney told Douprea she was a worthless whore, pushed her to the floor, and tackled her. On top of her, he twisted her arms and banged her head in the closet; she punched him in the nose again; and he moved his hands to her throat and said he was going to kill her.

Although the knife "was a threat" and she had not originally intended to stab Mooney, that changed when Mooney choked her. Frightened, she pulled out her knife to scare him. But Mooney just laughed and said she could not do anything.

Douprea stabbed Mooney lightly in the side of the neck with a puncturing motion, thinking that "a little poke" would scare him and get him to understand this was serious, without severely hurting him. The knife went into the side of Mooney's neck and she saw a little blood, but it did not phase him.

Mooney taunted Douprea for another 30 seconds and said he was going to kill her. Believing him, and feeling dizzy and unable to breathe, Douprea stabbed Mooney again. She thought that stabbing him the second time would make him get off her, without seriously hurting him. But "there might have been some aspect of it where I was like I don't ever want this to happen again"; she did not want Mooney to assault her anymore.

Mooney got up and fell backwards onto his bed. She tried to pull him to the bathroom to get a towel, but he fell down. She retrieved a towel, hoping to stop the bleeding with pressure, and held him for a few minutes. She called 911 but no one answered, so she called her mother, who called the police. She told her mother she

did not intend for this to happen and was scared Mooney was going to die.

Douprea put the knife in the diaper pail because she was scared. Then she showered for about two minutes because she was covered in Mooney's blood; she often took a shower to comfort herself when scared, hurt, or depressed. When she got out of the shower, she put on different jeans (but the same shirt), held Mooney again, and called the police about three more times.

After asking what the process would be if she were charged with murder, Douprea told police, "I think [a jury] would probably be more understanding due to the fact that I was protecting myself."

### 9. *Douprea's Condition at the Hospital*

Douprea was brought to the hospital at 7:59 p.m. Dr. Richard Reisman, an emergency room physician, examined Douprea for perhaps 10 minutes to see if she was able to go to jail. According to Dr. Reisman, Douprea was alert, her blood pressure was normal, and her pulse and breathing were a little fast. She complained of a headache and soreness in the back of her head and neck, explaining that she had been choked and thrown to the ground, hitting the back of her head several times. She also stated that she had been hit in the face with a fist and suffered a nose bleed.

Dr. Reisman found the back of Douprea's head tender but not swollen. A small reddened area next to the left nostril did not have much swelling; there was a little blood at the left nostril but no active bleeding. There was dried blood on both sides of the upper and lower lips. A little reddened area on the right side of the forehead had some swelling, but there was no tenderness or deformation in the face.

### 10. *Douprea's Prior Violence Against Other Men*

Douprea's former husband, Robert Melia, testified that his relationship with Douprea began in 2005. During the two or three months they initially lived together, Douprea had angry outbursts. In the first incident, Douprea threw a box at him, shoved him, and scratched him when he accused her of lying and cheating. The police were called, but Melia declined to have her arrested. Later in Calistoga, Douprea attacked him again, grabbing him and throwing things.

The couple moved to Las Vegas, where Douprea threatened suicide. She was hospitalized twice in a psychiatric ward, the second time voluntarily after she threatened to jump off a hotel parking garage. They also continued to have violent arguments. In September 2005, she ripped Melia's shirt, scratched his face, and punched him because he smoked a cigarette. When she returned from jail on October 2, 2005, Douprea threw a glass at Melia because he was drinking and smoking. Trying to intervene, Schneider pinned Douprea down while Gena called the police; Douprea bit Gena and bit and scratched Schneider. (Schneider and Gena described the altercation similarly at trial.)

At Gena's suggestion, Melia nonetheless married Douprea two or three days later. Subsequently, Douprea attacked Melia for not showing sexual interest in her; she punched, scratched, and kicked him, nearly ripping off his shirt and leaving fingernail scrape marks on his face. She threatened him by brandishing a three-inch knife, from her collection of 20 to 25 knives. Melia walked out and never returned.

Adam Patterson testified that he met Douprea at an Alcoholics Anonymous

8

meeting in 2005, and they had an off-and-on intimate relationship for about five or six months. Douprea's temper was unpredictable and severe, and they broke up about a month before she went to Las Vegas. When she returned, they lived together for perhaps a few months. On one occasion, he awoke to find her hitting him and trying to force him to have sex. In February 2006, after their relationship ended, Douprea dropped off some of Patterson's belongings at his residence; Patterson asked her to leave, and Douprea started yelling and threw a boot through his window. When Patterson opened the door, she punched and bit both Patterson and his roommate, Lawrence Mahoney. At some point, she was holding a small knife. Mahoney called the police, who took photographs of the damage Douprea caused to the apartment and the injuries she inflicted. Douprea later entered a plea to throwing the boot through the window.

Michael Schneider testified that he lived with Gena from 2003 to 2010 and experienced Douprea's violent temper as well. On one occasion, Schneider put Douprea's cat out of Gena's house, and Douprea grabbed a big knife from the kitchen and said she would kill him if he "messed" with her cat. On another occasion on April 11, 2006, Gena asked Schneider to get her a cup of coffee, and when Schneider made a rude comment, Douprea grabbed a knife from the kitchen and rushed at him. Raising his arm to block her, Schneider suffered a cut that required three stitches.

C. *Defense Case*

1. *Mooney's prior violence*

In January 2005 – nearly four years before Mooney's death – Mooney was stopped by the police while apparently intoxicated and about to drive. Unable to keep his balance and unresponsive to voice commands, he was taken to the hospital. Because he resisted when medics tried to insert an "IV" in his arm, he was handcuffed to a gurney.

The altercation between Douprea and Mooney in August 2008 was confirmed by Modesta Cardona (Jennifer's mother). According to Modesta, Mooney pushed Douprea out of the house, then hit her three or four times while she tried to defend herself.

In addition, Michael Cuadra, who met Douprea in December 2007 by answering her Craigslist ad for a "cuddle bunny," testified that Douprea said in August 2008 that she feared Mooney because he was drinking, belligerent, and mistreating her. She also claimed that she was nervous about doing anything because she did not want to get Mooney in trouble. On December 7, 2008, she sent Cuadra a text message that Mooney had said something like "the next time you bite me . . . I will shatter your face."

2. *Expert Witness Linda Barnard*

Linda Barnard, an expert in post-traumatic stress disorder (PTSD) and intimate partner violence (IPV), defined PTSD and IPV and the relationship between them. She testified that Douprea had PTSD from the cumulative effect of multiple traumas or cumulative traumatic stressors in her life. She also testified as to the effects of PTSD, including that PTSD was not consistent with initiating violence against another person. In addition, Barnard described IPV and "dissociation" generally, but she did not opine whether Douprea suffered from IPV and was not permitted to testify that Douprea was in a dissociative state on the day of the killing.

9

3. *Forensic Nurse Diana Emerson*

The court recognized Diana Emerson as "a forensic nurse practitioner," who conducts medical examinations and writes reports describing injuries, their significance, and possible causes. In Emerson's view, Dr. Reisman's examination of Douprea was not a forensic examination for manual strangulation, which requires a CT scan of the neck to check for swelling and trauma. In addition, Emerson explained, patients who have experienced only vascular pressure, such as to the jugular and carotid arteries, are likely to revive very quickly afterward; there may be no pain if there is no significant injury, and swelling can take several hours to appear.

Emerson pointed to photographs taken after the killing that, in her opinion, showed injuries on Douprea's neck consistent with strangulation. In addition, the bruising and swelling on Douprea's forehead, and the blood and swelling in her left nostril, were consistent with direct trauma. Bruises on Douprea's forearms were consistent with defensive injuries sustained from warding off blunt force trauma. Emerson concluded that Douprea was in a fight and appeared to have been strangled.

D. *Closing Arguments*

The prosecutor argued that Douprea attacked and killed Mooney because she was enraged at him for being drunk and refusing to attend the Christmas party. Her claim of self-defense was untrue; she "chose to stay in her room for a period of time, arm herself with a knife, [and] go in and kill" Mooney, while he was in a "stupor" from alcohol.

Defense counsel argued that Douprea suffered from PTSD, was a victim of IPV, and killed Mooney unintentionally or in self-defense. Mooney had attacked Douprea in a drunken rage, and when he choked her to the point she thought she would die, she used the knife to defend herself.

E. *Jury Verdict and Sentence*

The jury found Douprea guilty of first degree murder and found true the use enhancement under Penal Code section 12022, subdivision (b)(1). The court sentenced Douprea to 25 years to life for first degree murder plus one year for the use enhancement.

Douprea, 2012 WL 5987896, at *1–*8.

## III. DISCUSSION

A. **Standard of Review**

A petition for a writ of habeas corpus is governed by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

A district court may not grant a petition challenging a state conviction or sentence on the basis of a claim that was reviewed on the merits in state court unless the state courts' adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); Williams v. Taylor, 529 U.S. 362, 412–13 (2000). Additionally, habeas relief is warranted only if the constitutional error at issue "had substantial and injurious effect or influence in determining the jury's verdict." Penry v. Johnson, 532 U.S. 782, 795 (2001).

A state court decision is "contrary to" clearly established Supreme Court precedent if it "applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases," or if it "confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [its] precedent." Williams, 529 U.S. at 405–06. "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411.

Section 2254(d)(1) restricts the source of clearly established law to the Supreme Court's jurisprudence. "[C]learly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams, 529 U.S. at 412. "A federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme Court] is, at best, ambiguous." Mitchell v. Esparza, 540 U.S. 12, 17 (2003).

The state court decision to which § 2254(d) applies is the "last reasoned decision" of the

state court.  See Ylst v. Nunnemaker, 501 U.S. 797, 803–04 (1991);[4] Barker v. Fleming, 423 F.3d 1085, 1091–92 (9th Cir. 2005).  With respect to Petitioner's claims for habeas relief, some claims were raised only on direct review and denied in a reasoned decision.  Other claims were raised for the first time in her state habeas petition and summarily denied.  In reviewing each claim, the Court examines the last reasoned state court decision that addressed the claim.

When a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary.  Harrington v. Richter, 562 U.S. 86, 98 (2011) (one-sentence order denying habeas petition analyzed under § 2254(d)).  Accordingly, in reviewing the habeas claims not addressed by the state appellate court, this Court follows the Supreme Court's direction and "determine[s] what arguments or theories . . . could have supported" the California Supreme Court's rejection of the federal claim, and then gives deference to those arguments or theories under AEDPA.  Harrington, 562 U.S. at 102.

## B.    Petitioner's Claims

Petitioner has raised five claims:  (1) trial counsel was ineffective where she failed to investigate and present evidence of her mental condition at the time of the offense to negate first degree murder and support self-defense and imperfect self-defense; (2) trial counsel was ineffective when she failed to present Dr. Barnard with all of Petitioner's records; (3) trial counsel was ineffective where she failed to present blood splatter evidence that undercut the prosecution's case for first degree murder; (4) trial counsel was ineffective when she failed to object to admission of an already barred stabbing incident; and (5) her right to a conviction based on proof less than a reasonable doubt where violated by section 1109 of the California Evidence Code and the use of CALCRIM No. 852.  See ECF No. 12.

---

[4] Although Ylst was a procedural default case, the "look through" rule announced there has been extended beyond the context of procedural default.  Barker v. Fleming, 423 F.3d 1085, 1091 n.3 (9th Cir. 2005).  The look through rule continues as the Ninth Circuit held that "it is a common practice of the federal courts to examine the last reasoned state decision to determine whether a state-court decision is 'contrary to' or 'an unreasonable application of' clearly established federal law" and "it [is] unlikely that the Supreme Court intended to disrupt this practice without making its intention clear."  Cannedy v. Adams, 706 F.3d 1148, 1158 (9th Cir.), amended, 733 F.3d 794 (9th Cir. 2013).

1.      **Ineffective Assistance of Counsel**

Petitioner argues that trial counsel was ineffective in the following four ways:  failing to investigate and present evidence of her mental condition at the time of the offense to negate first degree murder and support self-defense and imperfect self-defense; failing to present Dr. Barnard with all of her records; failing to present blood splatter evidence that undercut the prosecution's case for first degree murder; and failing to object to admission of an already barred stabbing incident.

a.      **Legal Standard**

Claims of ineffective assistance of counsel are examined under <u>Strickland v. Washington</u>, 466 U.S. 668 (1984).  In order to prevail on a claim of ineffectiveness of counsel, the petitioner must establish two factors.  First, he must establish that counsel's performance was deficient, i.e., that it "amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom." <u>Harrington</u>, 562 U.S. at 105 (citing <u>Strickland</u>, 466 U.S. at 690).  "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance." <u>Id.</u> at 104 (quoting <u>Strickland</u>, 466 U.S. at 689).  Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Strickland</u>, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome. <u>Id.</u>  Where the petitioner is challenging his conviction, the appropriate question is "whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." <u>Id.</u> at 695.  "The likelihood of a different result must be substantial, not just conceivable." <u>Harrington</u>, 562 U.S. at 112 (citing <u>Strickland</u>, 466 U.S. at 693).  It is unnecessary for a federal court considering an ineffective assistance of counsel claim on habeas review to address the prejudice prong of the Strickland test if the petitioner cannot establish incompetence under the first prong. <u>Siripongs v. Calderon</u>, 133 F.3d 732, 737 (9th Cir. 1998).

The standards of both 28 U.S.C. § 2254(d) and Strickland are "highly deferential and when the two apply in tandem, review is doubly so." Harrington, 562 U.S. at 105 (internal quotation marks and citations omitted). "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id. The Strickland prejudice analysis is complete in itself and there is no need for an additional harmless error review under Brecht. Avila v. Galaza, 297 F.3d 911, 918 n.7 (9th Cir. 2002).

"[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." Strickland, 466 U.S. at 690–91. "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691.

That an attorney might have conducted a more thorough investigation does not establish deficient performance. Burger v. Kemp, 483 U.S. 776, 794 (1987). "[T]he duty to investigate does not force defense lawyers to scour the globe on the off chance something will turn up; reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." Rompilla v. Beard, 545 U.S. 374, 383 (2005). The question is not what the best lawyer or even what most good lawyers would have done, but whether a reasonable lawyer could have acted as defense counsel did. Coleman v. Calderon, 150 F.3d 1105, 1113 (9th Cir. 1998), rev'd on other grounds, 525 U.S. 141 (1998). Thus, the relevant inquiry is not what trial counsel could have done, but whether counsel's actions were reasonable. Babbitt v. Calderon, 151 F.3d 1170, 1173–74 (9th Cir.1998).

### b.      Mental Condition at Time of Offense

Petitioner argues that trial counsel was ineffective because she failed to investigate and present evidence of Petitioner's mental condition at the time of the offense – post-traumatic stress disorder ("PTSD"), dissociation, and intimate partner violence ("IPV") – to explain Petitioner's

perceptions and behaviors at the time of the killing to negate first degree murder and to support self-defense and imperfect self-defense. The Court first addresses Petitioner's claim that counsel failed to investigate, and then her contention that counsel failed to present evidence of her mental state or condition.

### 1) Failure to Investigate Mental Condition During the Offense

Petitioner argues that trial counsel was ineffective because she failed to investigate Petitioner's mental condition and functioning at the time of the stabbing. ECF No. 12 at 54–63. Petitioner argues that a review of Petitioner's psychological evaluations and records would have alerted "reasonably competent counsel" that, despite Petitioner's insistence that she acted in self-defense when she stabbed her boyfriend in the midst of a violent fight, Petitioner's history of mental disorders and trauma may have supported other potentially meritorious defenses to the charge of murder, or to negate the intent element of first-degree murder. Petitioner further argues that trial counsel should have investigated these alternative theories of the case by presenting Petitioner's psychological evaluations and records to a mental health professional to determine how Petitioner's mental illness and social history would have affected Petitioner's perceptions and behaviors at the time of the stabbing. Petitioner concludes that, without conducting this type of "reasonably diligent preliminary investigation," counsel lacked the framework within which to make a competent, informed tactical decision regarding the most effective presentation of a defense, and that the Strickland presumption therefore does not apply. Petitioner raised this claim in her petition for a writ of habeas corpus, ECF No. 24-5 at 48–58, which was summarily denied by the California Supreme Court, ECF No. 24-5 at 2. With respect to this claim, trial counsel has submitted a declaration, stating in relevant part:

> I remember reading the evaluation by Dr. Girbaldi and other evaluations that discuss disruption on almost all levels of Sheyna's psychological functioning, her reality distortion, inaccurate perceptions, and reactivity. I don't know why I did not act on it. There was no tactical reason. I had this information in the file. I did not give the reports to Dr. Cushing. I should have given these reports to a mental health expert for review. The fact that Sheyna exhibits these behaviors could have been presented to support imperfect self-defense. It could have also negated the elements of first degree murder.

ECF No. 3-4 at 6.

United States District Court
Northern District of California

Respondent does not directly address this claim in the answer. Respondent conclusorily states that trial counsel conducted a thorough investigation by hiring two mental health experts. ECF No. 20-1 at 19. Respondent also states that trial counsel pursued the defense that Petitioner insisted upon – self-defense – which was consistent with Petitioner's statement to the police and which, if successful, would have resulted in a complete acquittal.

### a) Deficient Performance

The United States Supreme Court has never required defense counsel to pursue every nonfrivolous claim or defense, regardless of its merit, viability, or realistic chance of success. Knowles v. Mirzayance, 556 U.S. 111, 125, 127 (2009) (not unreasonable for state court to conclude that trial counsel's performance was not deficient when he counseled defendant to abandon claim that stood almost no chance of success). However, defense counsel's failure to pursue a claim or defense must be reasonable under the circumstances. United States v. Chambers, 918 F.2d 1455, 1461 (9th Cir. 1990). The question, therefore, is whether it was reasonable for defense counsel to fail to investigate Petitioner's mental condition at the time of the charged offense.

Tactical decisions of trial counsel deserve deference when: (1) counsel in fact bases trial conduct on strategic considerations; (2) counsel makes an informed decision based upon investigation; and (3) the decision appears reasonable under the circumstances. See Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994). Whether counsel's actions were reasonable is a question of law considered under 28 U.S.C. § 2254(d)(1). Edwards v. LaMarque, 475 F.3d 1121, 1126 (9th Cir. 2007) (en banc). Counsel's investigation must determine trial strategy, not the other way around. Weeden v. Johnson, 854 F.3d 1063, 1066, 1073 (9th Cir. 2017) (granting habeas petition where mental condition was a factor in deciding whether defendant had required mental state to commit charged crime and counsel failed to obtain psychological evaluation; counsel could not have known that psychological evaluation would conflict with trial strategy without first knowing what examination would reveal). Here, a mental state defense theory – arguing that Petitioner suffered from PTSD, IPV, and dissociation at the time of the offense – would have been consistent with, and would have bolstered, Petitioner's theory of self-defense`.

16

A mental state defense would have highlighted that Petitioner has a reactive, rather than responsive, nervous system that causes her to misperceive her environment, to chemically overreact to environmental stimuli, and to suffer from extreme mood instability and relational dysfunction. ECF No. 3-1 at 5. An emphasis on Petitioner's mental state would be consistent with Petitioner reacting to the victim's strangulation attempt and threats by stabbing him with a pocket knife. A mental state defense would have countered the prosecution's theory that the victim could not have reasonably been perceived as a threat because the victim was in his own bedroom and incapacitated due to his alcohol consumption. Moreover, trial counsel has stated that she had no tactical reason for failing to provide Petitioner's records to a mental health expert for review.

The instant action is similar to <u>Weeden v. Johnson</u>, 854 F.3d 1063 (9th Cir. 2017), and <u>Seidel v. Merkle</u>, 146 F.3d 750, 757 (9th Cir. 1998), where habeas relief was granted because counsel failed to make a reasonable investigation.

In <u>Weeden</u>, the Ninth Circuit summarized the trial proceedings as follows:

> Sarah Weeden was convicted in California state court of felony murder and sentenced to twenty-nine years to life in prison for her role in a bungled robbery that occurred when she was fourteen. She was not present at the scene of the crime; the prosecution's case rested on evidence of her role in planning and facilitating the robbery.

> Weeden's defense at trial consisted entirely of four character witnesses [who testified that Weeden was not the type of person who would plan a robbery]. Trial counsel did not seek an evaluation by a psychologist or present expert testimony about the effect of Weeden's youth on her mental state. In post-trial proceedings, counsel claimed that he did not obtain an evaluation because the result might not support his defense strategy.

<u>Weeden</u>, 854 F.3d at 1066. The Ninth Circuit held that counsel's failure to investigate psychological testimony constituted ineffective assistance of counsel because counsel has a duty to investigate evidence *before* forming, and in order to reasonably form, a trial strategy. <u>Id.</u> at 1070 ("Under <u>Strickland</u>, counsel's investigation must determine trial strategy, not the other way around."). "The correct inquiry is not whether psychological evidence would have supported a preconceived trial strategy, but whether Weeden's counsel had a duty to investigate such evidence in order to form a trial strategy, considering 'all the circumstances.'" <u>Id.</u> The Ninth Circuit

further found that Weeden was prejudiced by counsel's failure to investigate because, had counsel presented testimony from a qualified expert regarding Weeden's mental state, there was a probability of a different result "sufficient to undermine confidence in the outcome." The only evidence presented by the prosecution regarding Weeden's intent was testimony by others about what she said and text messages sent months after the events at issue. Testimony from a qualified expert would have "added an entirely new dimension to the jury's assessment of the critical issue of Weeden's mens rea" by allowing the jury to consider the effect of Weeden's youth on her mental state. Id. at 1071–72. The Ninth Circuit concluded that the state appellate court's finding that counsel rendered adequate performance because he made a tactical decision not to investigate was contrary to, or involved an unreasonable application of, clearly established Supreme Court law; reversed the district court's denial of the writ of habeas corpus; and remanded the case with instructions to grant the writ of habeas corpus. Id. at 1071.

In Seidel, the petitioner was convicted of second-degree murder. His defense at trial was self-defense, but in his state collateral proceedings, he alleged that trial counsel was ineffective because he had deprived him of the meritorious defense of PTSD. Seidel, 146 F.3d at 752. The district court concluded that trial counsel's decision to rely exclusively on a theory of self-defense could not have been the product of reasonable professional judgment because, despite being put on notice,[5] trial counsel had conducted no investigation into the defendant's mental state and PTSD: "The fact remains that counsel had ample notice of Seidel's condition from objective sources, yet failed to conduct even a minimal investigation in order to make an informed decision regarding the possibility of a defense based on Seidel's mental illness." Id. at 756. The Ninth Circuit also found that Seidel had been prejudiced by this failure to investigate because a defense of mental illness could have negated the element of malice necessary to convict a defendant of second-

---

[5] In Seidel, trial counsel had both actual and constructive notice prior to trial that Seidel had an extensive history of mental problems. The pre-trial record indicated that Seidel had been been treated with medication by a prison psychiatrist while awaiting trial; and Seidel had been ben treated at a V.A. hospital for a mental disorder. Seidel testified at the federal evidentiary hearing that he had informed counsel about the symptoms related to his mental condition. Counsel's notes reflected her awareness that Seidel was on medication prescribed from the V.A. hospital and receiving medication from the jail. Seidel, 146 F.3d at 755–56.

degree murder.  Id. at 757.  The Ninth Circuit affirmed the lower court's grant of the writ of habeas corpus.

Here, similar to Weeden and Seidel, there were two potential non-conflicting available defense theories – self-defense and mental state – and trial counsel failed to fully investigate the mental state defense.  The fact that the defense theory pursued by trial counsel was the defense theory put forth by Petitioner does not, by itself, render trial counsel's decision reasonable for the purposes of a Strickland analysis.  "[A]n attorney who fulfills his or her duty to investigate the facts of a case may discover and need to act upon information contrary to that which the client has furnished."  Johnson v. Baldwin, 114 F.3d 835, 840 (9th Cir. 1997) (counsel's failure to investigate and discredit defendant's unconvincing denial that he was present at scene of alleged crime fell outside range of competent assistance because it deprived defendant of other defenses).  Trial counsel's failure to have a mental health expert review Petitioner's psychological reports and assess Petitioner's mental state at the time of the offense was not the product of reasonable professional judgment.

### b)     Prejudice

In order to establish prejudice, Petitioner "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Strickland, 466 U.S. at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  Id.

Petitioner argues that there is a reasonable probability that if counsel had investigated her mental state at the time of the offense, counsel would have presented evidence of mental illness, trauma, and IPV that would have negated the elements of first degree murder; supported imperfect self-defense and self-defense; and resulted in a verdict of either second degree murder or manslaughter.  Respondent argues that there was no reasonable likelihood that evidence of mental illness, trauma, and IPV would have compelled a different result because the evidence presented at trial against Petitioner was overwhelming, and because the additional records undercut Petitioner's credibility and detailed Petitioner's long history of violence against others.  ECF No. 20-1 at 24–25, 50–56.

Having carefully reviewed the record, the Court finds that Petitioner has failed to establish prejudice. To determine prejudice in a case where counsel failed to make a reasonable investigation to support a tactical decision, the Supreme Court considers whether a reasonable attorney would have made a different tactical decision if she had conducted a reasonable investigation, and whether there was a reasonable probability that the jury would have reached a different verdict had the attorney pursued the alternative strategy. Wiggins v. Smith, 539 U.S. 510, 536–38 (2003) (death penalty case discussing counsel's failure to discover and present certain mitigating evidence). In making the latter determination, a reviewing court must evaluate the totality of the evidence, both the evidence adduced at trial and the evidence adduced in the habeas proceedings, and it need not make the state-law evidentiary findings that would have been at issue at trial. Id.

It is unclear that counsel would have made a different tactical decision if she had conducted a reasonable investigation into a mental state defense. In fact, the record shows that trial counsel was aware of a potential mental state defense[6] but chose not to pursue such a defense. In addition, the trial court put limits on the extent to which a mental state defense could be presented, RT 866–74 (court warning that Dr. Barnard should not testify that Petitioner suffered from mental conditions that prevented her from forming the necessary specific intent for the charged crimes), 2000–02 (court stated that he did not think it was permissible for Dr. Barnard to testify that Petitioner was suffering from IPV); and trial counsel believed that there were significant limits as to whether she could present a mental state defense, RT 867 (agreeing that Dr. Barnard cannot say Petitioner is a battered woman). The record also shows that Dr. Barnard specifically repudiated her ability to confirm whether Petitioner had PTSD at the time of the offense:

---

[6] In her July 1, 2010 Domestic Violence Assessment of Petitioner, Dr. Barnard alerted counsel as to the possibility of a mental state defense. In her assessment, Dr. Barnard made six findings, one of which was: "The impact of intimate partner battering played a critical role in the perception, beliefs, and behaviors of Ms. Douprea at the time of the incident on December 14, 2008 that resulted in the death of Daniel Mooney." ECF No. 3-3 at 3. In addition, the prosecution expressed concern that, based on Dr. Barnard's report, counsel would attempt to argue PTSD as a mental defense. CT 865–68.

United States District Court
Northern District of California

| | |
|---|---|
| Barnard: | You can't diagnose somebody when you weren't there. So I may believe [Petitioner] has posttraumatic stress disorder by history, but I can't say for sure. I can only say for sure at a time when I evaluate someone whether they have posttraumatic stress disorder. |
| Prosecution: | So with regards to Ms. Douprea, your opinion is actually that on July 1st, 2010, she suffered from posttraumatic stress disorder or some other date? |
| Barnard: | From the time that I first evaluated her, my assessment was that she did. And my opinion that she had PTSD by history, but I can't attest to that. I can only attest to when I evaluate someone. |

RT 2035–36.

While there were clear limitations on the presentation of a mental state defense, there was significant evidence that supported a self-defense theory. The following evidence was introduced that supported the defense theory that Petitioner reasonably considered herself to be in imminent danger from Mooney. Four months prior to the offense, Mooney pushed Petitioner out of the apartment and hit her, leaving her with an injury to her hip and some scratches to her hand. Around that time, Petitioner told Cuadra that she feared Mooney because he was belligerent and had been mistreating her. RT 2207, 2216. She described Mooney as unpredictable. RT 2216. Two months prior to the offense, Mooney began drinking again. The week before the offense, Petitioner confided in Caudra that Mooney was still threatening her and had told her something to the effect of "the next time you bite me . . . I will shatter your face." RT 2208. The night before the offense, Mooney came home drunk and got into a fight with Petitioner when she expressed disapproval that he had been drinking. Mooney swung at Petitioner and choked her. CT 518–19. Petitioner consistently reported that she stabbed Mooney in self-defense, even though she was inconsistent as to other details of that day. Given the significant evidence supporting a self-defense theory, the limitations on presenting a mental state defense, and the potential conflict between those theories, a reasonable attorney that had conducted a reasonable investigation into a mental state defense might still have reasonably chosen to argue self-defense.

Nor has Petitioner established that there was a reasonable probability that the jury would have reached a different verdict had counsel argued both self-defense and a mental state defense. First, it is unclear that the trial court would have allowed Petitioner even to present a robust mental health defense. As discussed above, the trial court significantly limited the extent to which the

mental state defense could be presented. When the prosecution asked Dr. Barnard if Petitioner was suffering from PTSD on the night of the offense, Dr. Barnard answered in the affirmative and then began to state that she believed that Petitioner was also suffering from other mental states at the time. The trial court *sua sponte* cut off Dr. Barnard and stated: "I'm going to cut it off there. There are certain opinions you're allowed to give that are valuable to the jury and others that are not." RT 2069.

Second, the jury knew of Petitioner's potential mental health issues, yet still found Petitioner guilty of first-degree murder. The jury heard Dr. Barnard's professional opinion that Petitioner likely has had PTSD since her childhood and that she suffered from IPV in her relationship with Mooney, as well as in her prior relationships. RT 2012, 2050–66. The jury also heard about how PTSD and IPV affect an individual's behavior and perceptions, and how a person suffering from PTSD and IPV would react to certain situations. RT 1961–80. Dr. Barnard also testified briefly about dissociation. RT 1967. Although the defense did not emphasize that Petitioner suffered from PTSD, IPV, and dissociation at the time of the offense, Dr. Barnard's testimony introduced the possibility that Petitioner's mental state at the time of the offense was affected by her mental health issues. Despite being in possession of information regarding Petitioner's mental state, the jury found Petitioner guilty in less than nine hours. CT 311–12. Petitioner argues that the jury's request for clarification regarding the difference between first-degree and second-degree murder indicated that the prosecution's case for murder was weak, and that the jury questioned the sufficiency of the evidence of premeditation and deliberation. ECF No. 31 at 19. However, given the jury's promptness in rendering its verdict, and the fact that the jury rendered its verdict with only an additional hour of deliberation after the trial court addressed its request for clarification,[7] the request for clarification appears to be merely a request for clarification and not an indication that the prosecution's case for first-degree murder was weak.

Third, while evidence that Petitioner had disassociated during the offense arguably negated

---

[7] The jury submitted this request for clarification at the end of their first day of deliberation, after five hours of deliberation. The trial court responded the following day after the jury had deliberated another two hours, and the jury rendered its decision after approximately another hour of deliberation. CT 311–12.

the intent for first-degree murder, evidence of dissociation did not support the self-defense theory and was inconsistent with Petitioner's statements during the police interview. The jury was instructed that self-defense was defined as according to the reasonable belief that one is in imminent danger of being killed or suffering great bodily injury. RT 2461. In contrast, Dr. Barnard described dissociation as a person "splitting off from their emotions" and not feeling what the person is experiencing. RT 1967. In addition, Petitioner's description of her mental state at the time of the offense was inconsistent with dissociation. Petitioner described thinking deliberately, if in a panicked fashion, about the situation. She considered how to use the knife to scare the victim and get the victim to back off. CT 528–30 577, 586.

Finally, in introducing evidence of Petitioner's mental condition, Petitioner would open the door to evidence that undermined her credibility and countered her version of events.

Evidence regarding Petitioner's PTSD diagnosis could undermine Petitioner's credibility. The traumatic events that triggered Petitioner's PTSD were witnessing abuse of her mother, being molested as a child, and experiencing IPV in prior relationships. ECF No. 3-3 at 3. With respect to the accusation that she had been molested by Shawn Wilson, her mother's boyfriend, a close examination of Petitioner's records indicate that (1) Petitioner had recanted those accusations, stating that she made up the accusation so that she could live with her boyfriend (ECF No. 4-24 at 25–26); (2) a police investigation found the accusations to be unsubstantiated (ECF No. 4-22 at 4); (3) a police officer deemed her a not credible witness with respect to these accusations (ECF No. 44-21 at 9); and (4) a therapist doubted the accusations because while Petitioner had been in therapy for many years, she had never mentioned the molestation (ECF No. 4-24 at 21, 23). Accordingly, introducing and emphasizing Petitioner's PTSD diagnosis might have instead significantly undermined Petitioner's credibility because it introduced evidence that she was willing to make a false accusation to benefit herself; and that law enforcement and her therapist doubted her credibility. Whether Petitioner committed first-degree murder or acted in self-defense turned on her credibility. Should the jury believe Petitioner's version of events – that she stabbed Mooney in the closet because she feared for her life – or should the jury believe the prosecution's version of events that, at the time of the offense, Mooney was in his room and not a threat due to

intoxication and other factors?  Although the presentation of further PTSD evidence could negate the elements of first-degree murder, it could also undercut the defense theory of the case.

Because Petitioner had acted violently in her prior relationships, evidence regarding Petitioner's IPV diagnosis could undermine the self-defense theory by suggesting that Mooney, and not Petitioner, was the victim of IPV.  In fact, the prosecution argued exactly that.  The prosecution repeatedly questioned Dr. Barnard as to whether Mooney suffered from IPV from Petitioner.  RT 2050–66.  In his closing argument, the prosecutor argued the intimate partner violence to be considered was Petitioner's acts of, and tendency towards, violence towards her intimate partners.  RT 2476–79.

Finally, the instant case differs from the cases cited above where prejudice was found.  In Weeden, the Ninth Circuit found prejudice in the following specific circumstances:

> We hold only that: (a) in a murder case involving a defendant who was fourteen years old at the time of the crime; (b) in which mens rea was critical given the defendant's absence from the crime scene and the prosecution's felony murder theory; (c) where the defendant's trial counsel declined to investigate psychological testimony because he feared what he might learn; (d) where the only expert psychological report in the post-conviction record concluded that the defendant was "extremely unlikely" to have formed the requisite mens rea; and (e) where the state court nonetheless concluded that the defendant received effective assistance because a psychological examination "might" have undermined counsel's preselected strategy, habeas relief should issue.

Weeden, 854 F.3d at 1072–73 (internal footnotes omitted).  In Weeden, there was no contemporaneous direct evidence of Weeden's *mens rea*; the prosecution relied on witness testimony as to Weeden's statements at the time, and on text messages that Weeden sent months after the incident.  No psychological testimony was presented.  The psychological testimony regarding the effect of Weeden's age on her mental state was therefore critical to providing a different perspective on Weeden's actions at the time.  Here, however, counsel did present evidence regarding Petitioner's general mental health, yet the jury still returned a guilty verdict.  In addition, there was contemporaneous direct evidence of Petitioner's *mens rea* at the time in the form of the police interview.  As a result, evidence of Petitioner's mental condition at the time would not have had the same persuasive effect as the psychological testimony contemplated in Weeden.  It would be evaluated against Petitioner's statements in her police interview.

In <u>Seidel</u>, Seidel was convicted of second-degree murder for stabbing the victim during a fight. The defense relied on a theory of self-defense, but did not conduct a psychological evaluation. A psychological evaluation conducted pursuant to state collateral proceedings revealed that the defendant had PTSD, some residual brain damage, and long-term memory impairment. The Ninth Circuit agreed with the district court's finding that Seidel was prejudiced by counsel's failure to investigate a mental state defense:

> As the district court below found, "A defense of imperfect self-defense based on the facts of the case, coupled with petitioner's mental state at the time of the fight, the PTSD symptoms, and the organic brain damage would have eliminated the element of malice." We agree with the district court that if counsel had introduced Dr. Koller's evaluation at trial, which documented both "clear symptoms of PTSD" and "chronic brain damage," along with other evidence in the record of Seidel's mental illness, the jury in all likelihood would have returned a verdict of manslaughter instead of murder.

<u>Seidel</u>, 146 F.3d at 757. Again, as discussed above, counsel did present evidence regarding Petitioner's general mental health, yet the jury still returned a guilty verdict. Moreover, as discussed *supra*, based on the facts of this case – where there was evidence that Petitioner had recently engaged in physical altercations with the victim, where there was no direct evidence supporting Petitioner's version of events, where the victim had a high blood alcohol content level, and where Petitioner's credibility was undermined by her inconsistent statements at the police interview – there is not a reasonable probability, sufficient to undermine confidence in the outcome if Petitioner's trial, that introducing evidence of Petitioner's mental condition at the time would have resulted in a different verdict

In <u>Wiggins</u>, the Ninth Circuit found that Wiggins was prejudiced by trial counsel's failure to investigate and present at sentencing mitigating evidence of a troubled history that courts have previously declared relevant to assessing a defendant's moral culpability. Specifically, the mitigation evidence not presented indicated that Wiggins experienced severe privation and abuse in the first six years of his life; suffered physical torment, sexual molestation, and repeated rape in subsequent years in foster care; had diminished mental capacities; and spent significant time homeless. The only mitigating evidence presented was that Wiggins had no prior convictions. The defense theory focused on Wiggins' lack of direct responsibility for the murder. The Ninth

Circuit found that had the jury been confronted with this considerable mitigating evidence that showed severe and extensive abuse, there was a reasonable probability that it would have returned with a different sentence. Wiggins, 539 U.S. at 535–36. As discussed *supra*, presenting evidence of Petitioner's mental condition risked undermining Petitioner's credibility and the self-defense theory. Moreover, in this case, the jury was presented with evidence that Petitioner suffered from PTSD, dissociation, and IPV and still returned a guilty verdict on the count of first-degree murder.

Although Petitioner has established deficient performance due to counsel's failure to investigate her mental condition at the time of the offense, she has not established prejudice from that deficient performance. Petitioner is therefore not entitled to habeas relief on this claim.

### 2) Failure to Present PTSD, Dissociation, and IPV

Petitioner argues that trial counsel was ineffective because she failed to present evidence of Petitioner's mental condition at the time of the offense to explain Petitioner's perceptions and behaviors, and that such evidence would have negated first degree murder and supported self-defense and imperfect self-defense. ECF No. 12 at 52–60. Petitioner raised the failure to present these claims in her petition for a writ of habeas corpus, ECF No. 24-5 at 51–63, 65–69, 76–81, which was summarily denied by the California Supreme Court, ECF No. 24-5 at 2. On direct appeal, Petitioner presented two claims that are related to the failure to present evidence of dissociation and IPV: the trial court in precluding the expert witness from testifying the Petitioner suffered from IPV and was in a dissociative state on the day of the killing. The state court denied these claims as follows:

A. *Exclusion of Expert Witness Testimony*

Douprea contends the trial court erred by precluding Dr. Barnard from testifying that Douprea was a battered woman (i.e., suffered from IPV) and was in a dissociative state on the day of the killing. She further argues that, to the extent her trial attorney agreed that Barnard could not testify that Douprea suffered from IPV, she received ineffective assistance of counsel.

1. *Background*

In July 2010, at defense counsel's request, Dr. Barnard authored a domestic violence assessment report of Douprea. In her report, Barnard concluded that Douprea was a "battered woman" and described her abusive history with Mooney in the context of IPV. Barnard also described Douprea's history of "dissociation" since childhood, including instances of "cutting," periods when she "lost

memories," and "blank periods during the series of events resulting in and subsequent to [Mooney's] death." Barnard suggested that Douprea likely experienced a dissociative state on the day she killed Mooney, concluding that "[m]uch of what occurred was likely in a dissociative state and memory tracks were disrupted."

The prosecutor filed an in limine motion to exclude, inter alia, Dr. Barnard's opinion that Douprea is a battered woman. The prosecutor contended that IPV testimony must be limited to general information about a class of victims, not the ultimate issue of Douprea's mental state at the time of the offense.

An ensuing hearing addressed the extent to which Dr. Barnard could testify regarding IPV, as well as PTSD. As to IPV, the prosecutor acknowledged that Dr. Barnard could testify about IPV "in a general way," but Barnard could not "make the factual finding she's a battered woman." Defense counsel *agreed,* stating: "[Barnard] *cannot say Ms. Douprea is a battered woman,*" but she can opine that Douprea was suffering from PTSD and describe how IPV can affect perception. (Italics added.) Defense counsel added that she would ask Barnard hypotheticals, but that she would "admonish [Barnard] not to blurt out that Sheyna Douprea in her opinion was a battered woman."

As to PTSD, defense counsel asserted that she retained Dr. Barnard to explain that PTSD explained Douprea's "flat affect" in her interview with police, to rebut any prosecution argument that she was being "remorseless or uncaring." The prosecutor agreed with defense counsel that Barnard could testify that "she's got PTSD." In addition, defense counsel said that PTSD explained Douprea's dissociative state during the interview, and the prosecutor agreed that PTSD was "fair game." Thus, by the time of Barnard's direct examination, the parties had agreed she could opine that Douprea had PTSD, but not that she was a victim of IPV.

On direct examination, Dr. Barnard testified within these confines. She opined that Douprea suffered from PTSD, but testified only generally about IPV, including the "cycle of violence," "traumatic bonding," common myths about abused persons, and the fact that victims commonly remain in abusive relationships even when they could leave.

Dr. Barnard also testified generally about "dissociation." When defense counsel attempted to elicit Barnard's opinion that Douprea had entered into a dissociative state, however, the court sustained the prosecution's objection. Defense counsel then asked Barnard: "Hypothetically, if a person is sitting in an interview and they are . . . questioned about the death of their partner and they have a very flat affect, what would you attribute that to?" Barnard answered: "It could be attributed to shock or . . . dissociation." Barnard subsequently testified that taking a shower after a traumatic event could be done in a dissociative state as a way to decrease anxiety.

The court later explained, outside the presence of the jury, that it had barred Dr. Barnard from opining that Douprea "was suffering from dissociation [*sic* ]" because it "was going to get into PC 29 issues, getting to ultimate facts whether she had intent or didn't have intent." [FN 7]

> FN 7: Penal Code section 29 states in part that an expert testifying about a defendant's mental illness, disorder, or defect may not testify "as to whether the defendant had or did not have the required mental states."

27

### 2. *Absence of Opinion That Douprea Was a Battered Woman (IPV Victim)*

Evidence Code section 1107 permits testimony concerning the physical, emotional, or mental effects of IPV upon the beliefs, perceptions, or behavior of domestic violence victims. An expert witness may also offer an opinion as to whether a defendant actually suffers from IPV. (*People v. Aris* (1989) 215 Cal.App.3d 1178, 1185 (*Aris*), disapproved on another ground in *People v. Humphrey* (1996) 13 Cal.4th 1073, 1089 (*Humphrey*).)

Here, however, defense counsel expressly agreed that she could not, and would not, elicit Dr. Barnard's opinion that Douprea suffers from IPV. Douprea cannot now claim that the trial court erred because it did not admit evidence that Douprea's attorney declared was inadmissible and elected not to introduce.

In her reply brief, Douprea argues that defense counsel had proffered Dr. Barnard's entire report – which included the IPV opinion – and the court engaged in an analysis and explicitly ruled that the opinion was inadmissible. [FN 8] But the court's comments came long *after* defense counsel represented that Barnard could not opine that Douprea was a "battered woman," appearing to be in full agreement with the prosecutor on this point. The court's later remark that such evidence was inadmissible does not establish that an offer of proof and argument for its admissibility would have been futile. (Evid. Code, § 354, subd. (a); see *People v. McKinnon* (2011) 52 Cal.4th 610, 659.) Douprea fails to establish judicial error.

> FN 8: At one point, the court indicated there had been a sidebar discussion as to whether Dr. Barnard would testify that Douprea had IPV, and the court believed such testimony was impermissible because it pertained to an "ultimate decision" and "an opinion on guilt or innocence;" defense counsel stated, however, that she had been arguing for admission of an opinion regarding PTSD, *not* IPV. Later, the court stated that it had excluded the opinion that Douprea was suffering from IPV because the evidence would have been misleading and the record would have been "convoluted," citing Evidence Code section 352.

### 3. *Counsel's Failure to Seek Admission of the Battered Woman/IPV Opinion*

Douprea next argues that her attorney provided ineffective assistance in failing to insist that Dr. Barnard's IPV opinion be admitted. To prevail on a claim of ineffective assistance, a defendant must show that (1) counsel performed incompetently and (2) in the absence of counsel's error, there is a reasonable probability the defendant would have obtained a more favorable result. (*Strickland v. Washington* (1984) 466 U.S. 668, 690, 694; *People v. Hart* (1999) 20 Cal.4th 546, 623–624.)

Douprea contends her attorney should have sought admission of Dr. Barnard's opinion that Douprea suffers from IPV and rebutted the prosecutor's argument for excluding it. After all, she argues, the prosecutor had analogized to cases pertaining to other types of expert testimony (child sexual abuse accommodation syndrome and rape trauma syndrome) – an analogy *Aris* rejected (215 Cal.App.3d at p. 1199). Furthermore, Douprea claims, the IPV evidence was relevant to the subjective aspect of imperfect self-defense, the objective aspect of self-defense, Douprea's credibility, whether Douprea had the mental states for the charged crime, and heat of passion.

Respondent counters that the law at the time of trial was not as clear for defense

counsel as Douprea asserts. Moreover, respondent urges, defense counsel had a reasonable tactical purpose for not eliciting an opinion that Douprea suffered from IPV.

We agree there was a reasonable tactical justification for not eliciting Dr. Barnard's opinion that Douprea suffered from IPV. By introducing IPV evidence about how IPV affects perceptions and explains an IPV victim's decision to stay with her partner, but *not* attempting to have Barnard opine expressly that Douprea suffered from IPV, defense counsel was able to suggest to the jury that Douprea was an IPV victim and that Barnard thought so, while avoiding a blistering cross-examination of Barnard that would have likely demonstrated Douprea was not an IPV victim and Barnard was wrong to conclude she was. Or, to put it a bit differently, there was so much evidence contrary to the conclusion that Douprea was an IPV victim that it would have made it appear that Barnard was overreaching and thus diminish her credibility.

For example, in reaching her conclusion that Douprea suffered from IPV in her report, Dr. Barnard apparently spoke only to Douprea and did not consider the evidence that Douprea was more of an abuser than a victim. Barnard did not speak to Patterson and Melia, who testified that Douprea repeatedly assaulted them. Barnard accepted Douprea's depiction of certain encounters, and did not review the police report from a February 2006 incident when Douprea allegedly attacked Patterson and his roommate Mahoney. Nor did Barnard acknowledge that Douprea entered a plea to vandalizing Patterson's apartment, or consider Melia's contention that Douprea attacked him (as documented by the reports Barnard allegedly reviewed) including a time when Douprea brandished a knife. Nor did Barnard's report note an altercation between Schneider and Douprea, in which Douprea allegedly became enraged at Schneider for putting out her cat, brandished a knife at him, and threatened to kill him. Nor did the report mention Schamen's account of Douprea violating a restraining order and hitting Mooney over the head with a towel rack. And in applying indicators of IPV to suggest that Mooney was subjecting Douprea to IPV, Barnard accepted Douprea's uncorroborated assertions, including that Mooney controlled the use of their money.

A closer question is whether this tactical reason was, in fact, what prompted Douprea's counsel not to press for admission of Dr. Barnard's opinion, or whether counsel simply misunderstood the law. Douprea argues that, because defense counsel told the court she "didn't highlight the admissible parts [of Barnard's report] because I'm going to try to get *as much as I can,*" counsel's agreement that Barnard could not testify that Douprea is a battered woman must have been due to her belief that she could not elicit that opinion under the law. Nonetheless, while defense counsel displayed more of an "I can't get it in" attitude as opposed to an "I don't want to get it in" attitude, the record does not preclude the possibility that defense counsel went along with the prosecutor's position because it furthered the defense strategy. And although Douprea contends that defense counsel did not shy away from eliciting the opinion just to avoid cross-examination of Barnard because Barnard faced vigorous cross-examination anyway, the fact of that vigorous cross-examination only underscores the reasonableness of a defense tactic to avoid yet more fodder for the prosecutor's questioning. In short, the record does not affirmatively show that defense counsel's position was not a matter of tactics.

At any rate, Douprea's ineffective assistance claim fails on the prejudice prong. Even without Dr. Barnard's opinion that Douprea was a battered woman suffering from IPV, the jury had ample evidence with which to determine whether she was a victim of IPV and how it might have affected her behavior. In this light, Barnard's opinion, resulting in a severe cross-examination, would not have helped Douprea

much. And because there was so much evidence contrary to Barnard's conclusion that Douprea suffered from IPV, and so many matters Barnard had apparently not considered in reaching that conclusion, there is no reasonable likelihood that jurors, unconvinced that Douprea suffered from IPV based on the IPV evidence that was admitted, would have become convinced that she did suffer from IPV merely upon Barnard saying so. Accordingly, it is not reasonably probable that Douprea would have obtained a more favorable outcome if Barnard had testified that Douprea was an IPV victim. Douprea fails to demonstrate ineffective assistance of her trial counsel.

### 4. Dissociative State

Douprea contends the court erred in excluding Dr. Barnard's testimony that she entered into a dissociative state. We review the court's ruling for an abuse of discretion. (*People v. Cortes* (2011) 192 Cal.App.4th 873, 908 (*Cortes*).)

To the extent the court precluded such testimony based on Penal Code section 29, the court was mistaken. Penal Code Section 29 provides that an expert witness shall not testify as to whether the defendant had the required mental *states* for the crimes charged. But it does not prohibit an expert witness from opining that the defendant suffers from a mental *disorder or condition*. (*Cortes, supra,* 192 Cal.App.4th at p. 908–911.) The statute therefore did not preclude Dr. Barnard from opining that Douprea was in a dissociative condition on the day of the killing. (*Ibid.*)

The next question, however, is whether the evidence was inadmissible for some other reason or, if not, whether the error was harmless. To decide this question, we must look more closely at the evidence Douprea attempted to elicit. At trial, defense counsel asked Dr. Barnard whether Douprea was in a dissociative state when Detective Shooter interviewed her, and she elicited Barnard's testimony that a person who takes a shower after a killing might be in a dissociative state. Douprea now claims that Barnard should have also been permitted to testify that Douprea dissociated when stabbing Mooney and hiding the murder weapon, although counsel did not attempt to elicit such testimony at trial. We will consider the latter point first.

### a. *dissociation when stabbing Mooney and hiding the knife*

Because defense counsel did not ask Dr. Barnard whether Douprea dissociated when she stabbed Mooney or when she hid the knife, or make any offer of proof to that effect, Douprea cannot now contend that the court erred by excluding such testimony. Nor can it be argued successfully that defense counsel's failure to elicit this testimony was due to the court's refusal to permit other evidence of dissociation, since the record does not indicate that Barnard *would* have testified that Douprea was in a dissociative state when she stabbed Mooney or hid the knife, even if she had been asked to do so.

Dr. Barnard's report did not opine that Douprea dissociated when she stabbed Mooney or hid the knife. In her "Summary of Findings," Barnard mentions that Douprea "has a history of dissociative experiences beginning in childhood," but she concludes that it was the "impact of intimate partner battering" – not dissociation – that played a critical role in Douprea's perceptions at the time of the incident that resulted in Mooney's death. Elsewhere in her report, Barnard reasserts that Douprea has a history of dissociation beginning in childhood, but there is no mention of any dissociation during or after the stabbing except, vaguely, that "[s]he also has blank periods during the series of events resulting in and subsequent to

Daniel's death." Barnard does not identify those blank periods, but we know it cannot be Douprea's stabbing Mooney or hiding the knife (or taking a shower, see *post*) because Barnard reports Douprea's distinct recollection of these matters. [FN 9]

> FN 9: Dr. Barnard's report adds: "In this case, [Douprea] has significant gaps in memory. She has a recollection of the basics of what occurred prior to [Mooney] being stabbed, but many details are lost or out of order. She has even more significant gaps in memory for behavior subsequent to [Mooney] being stabbed. She knows she was frantically moving about but cannot effectively recount her actions or the sequence of her actions. Much of what occurred was likely in a dissociative state and memory tracks were disrupted." But the stabbing and hiding the knife were not forgotten.

Moreover, Dr. Barnard's description of dissociation indicates that Douprea did *not* dissociate when she stabbed Mooney or hid the knife. In her report, Barnard defined dissociation as a "response to severe trauma" in which "the psyche 'splits off.'" "[T]he person experiences a sense of detachment from self . . . [during which] there is a persistent or recurrent experience of feeling detached from one's mental processes or body, as if one is outside their own body observing." Barnard said dissociation "can even take the form of traumatic amnesia, where the person has no memory at all for certain events or actions." By contrast, Douprea made clear to the police and to Barnard that she was aware of what was happening when she stabbed Mooney and the reasons she did it. That is quite the opposite of the "detachment" indicative of dissociation.

Finally, an opinion that Douprea dissociated at the time of the killing would have been inconsistent with Douprea's primary defense – that she stabbed Mooney because she *perceived* an imminent deadly threat, not in a detached state of dissociation. [FN 10]

> FN 10: Douprea argues that the dissociation evidence was consistent with her claim of self-defense, because she was aware that she was in a life-threatening situation and intended to use the knife to defend herself but dissociated in response to the trauma. For this proposition, she cites *Cortes, supra,* 192 Cal.App.4th 873, which held it was error to exclude an expert's opinion that the defendant had entered into a dissociative state, where the expert seemingly opined that the defendant stabbed the victim one time out of self-defense and then additional times in a dissociative state. (*Id.* at pp. 893–894.) *Cortes* is readily distinguishable. There, the expert's report recounted that the defendant said the "noise around him disappeared," he saw his hand "stabbing down through silence," and he lacked memory of his continued stabbing of the victim. (*Id.* at p. 893.) From this the expert drew his opinion of dissociation. (*Id.* at pp. 893–894.) In the matter before us, Dr. Barnard's report did not specify any particular indication of dissociation during the stabbing. Moreover, unlike the defendant in *Cortes,* Douprea never told the expert or the police that the first stab was for self-defense and the rest were in the context of an out-of-body experience or other circumstance from which dissociation might be inferred.

For all of these reasons, we find that the absence of any opinion that Douprea dissociated in stabbing Mooney and hiding the knife was not the result of judicial error, and even if it were error, there is no reasonable probability that the opinion, if admitted, would have led to a more favorable outcome for Douprea.

Douprea, 2012 WL 5987896, at *8–*9, *11–*13.

31

With respect to these claims, trial counsel has submitted a declaration stating in relevant part:

> I had no tactical reason for failing to elicit from Dr. Barnard testimony as to how PTSD and dissociation would have affected Sheyna's behaviors, perceptions, and mental functioning at the time of the killing to support imperfect self-defense or to negate the elements required for first degree murder. If I should have had Dr. Barnard testify to those things and I did not, that was my mistake.
>
> I did not have a tactical reason for failing to present more evidence to support imperfect self-defense and argue to the jury the alternative theory that Sheyna killed Mr. Mooney in a real but unreasonable belief in the need to self defend, as it would not have been inconsistent with the self-defense evidence presented.
>
> Any speculation that I had a strategic reason for not wanting to elicit Dr. Barnard's opinion that Sheyna is a battered woman is incorrect. I wanted Dr. Barnard to testify that Sheyna suffered from IPV. Dr. Barnard was firm in her opinion that Sheyna was an IPV victim. That was the defense, so of course I wanted the jury to hear Dr. Barnard's opinion. Dr. Barnard's opinion was necessary to the defense. It was absolutely not a tactical decision. I certainly do not remember conceding that Dr. Barnard could not offer her opinion. The reason that I did not ask Dr. Barnard the question was because Judge Medvigy warned me that if I did, he would not allow it and would embarrass my witness in front of the jury. If I did not put enough on the record as to why I did not push further to have Dr. Barnard testify that in her opinion Sheyna was an IPV victim, that was my error.

ECF No. 3-4 at 5–6.

The Court finds that the state court's denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Nor was the state court's denial based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. As discussed in detail *supra*, Petitioner was not prejudiced by counsel's failure to present evidence of her mental condition at the time of the offense. There is not a reasonable probability that the jury would have reached a different verdict had counsel presented evidence regarding Petitioner's mental state at the time of the offense. Petitioner is therefore not entitled to habeas relief on this claim.

### c. Failure to Provide Expert with Records

Petitioner argues that trial counsel was ineffective because she failed to adequately prepare Dr. Barnard in that she failed to provide Dr. Barnard with the extensive records documenting Petitioner's history of mental illness, traumatic upbringing, and complete history of assaultive behavior. This failure rendered Dr. Barnard unable to effectively respond to the prosecutor's

cross-examination. Petitioner raised this claim in her petition for a writ of habeas corpus, ECF No. 24-5 at 70–75, which was summarily denied by the California Supreme Court, ECF No. 24-5 at 2. With respect to this claim, trial counsel has submitted a declaration, stating in relevant part:

> I did not provide Dr. Barnard with the mental health evaluations I had gathered. I did not have a tactical reason for failing to do so. I did not provide Dr. Barnard with the police reports regarding the childhood allegations of molestations made by Sheyna because Sheyna recanted some allegations and I did not want evidence of Sheyna lying coming in at trial.

ECF No. 3-4 at 6.

The Court finds that the state court's denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Petitioner has not cited any clearly established federal law, and the Court is aware of none, that requires counsel to provide an expert with all the information in her possession, or even all the information that might be relevant to responding to cross-examination. Counsel has a duty to provide experts with information relevant to the conclusions of the expert. See Caro v. Calderon, 165 F.3d 1223, 1226 (9th Cir. 1999). But, absent a request for information from an expert, counsel does not have a duty "to acquire sufficient background material on which an expert can base reliable psychiatric conclusions." Bloom v. Calderon, 132 F.3d 1267, 1277 (9th Cir. 1997); see, e.g., Turner v. Calderon, 281 F.3d 851, 876–77 (9th Cir. 2002) ("Failure to provide a psychologist with facts about a defendant's family history ordinarily cannot support a claim of constitutionally ineffective assistance."); Murtishaw v. Woodford, 255 F.3d 926, 945 & n.9 (9th Cir. 2001) (finding no IAC where, in the absence of a specific request, counsel failed to inform experts of capital defendant's family history of mental illness; distinguishing Bean where Ninth Circuit found IAC during penalty phase of capital case because *inter alia* counsel ignored expert's requests for information). There is no record of Dr. Barnard requesting additional materials.

Nor was the state court's denial based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. Petitioner and Dr. Barnard argue that Dr. Barnard was inadequately prepared for cross-examination without the additional records because she was unable to effectively corroborate and support her diagnosis on cross-examination.

However, this argument is contradicted by Dr. Barnard's testimony. On cross-examination, Dr.

Barnard testified that she felt the materials provided were sufficient for her to make an accurate

diagnosis. After a series of questions by the prosecutor as to whether she had considered other

types of records (jail records, other psychiatric records, domestic violence program records,

psychological evaluations) or interviewed witnesses in reaching her diagnosis, Dr. Barnard

testified,

> [Whether it is helpful to know as much as possible about the person that you're interviewing by reviewing all records] sort of depends. Sometimes more is not better. Sometimes more is just more. So when I look at a case, what I look and see is whether it seems like there's enough information for me to make a determination. If I think I need more information, then I'll request that, and if I don't, I don't.

CT 2018–19. Dr. Barnard also testified that she seldom received the complete psychiatric history

of an individual before she interviewed them "unless that's a huge issue." CT 2067. Petitioner

argues that Petitioner's mental health history was a "huge issue" here, thereby requiring an

effective counsel to provide Dr. Barnard with her records prior to her evaluation of Petitioner.

ECF No. 12 at 65. However, Petitioner's interpretation of Dr. Barnard's statement is inconsistent

with Dr. Barnard's earlier statement that she did not need further materials to reach her diagnosis.

In addition, Petitioner's interpretation of Dr. Barnard's statement is unreasonable given the

context. Generally speaking, an individual's mental health is a central issue if Dr. Barnard is

retained to conduct an evaluation. Dr. Barnard's response is more reasonably understood as

saying that unless the entire psychiatric history is a huge issue, she commonly only receives the

types of materials that trial counsel provided her.[8] Finally, the crux of the prosecution's cross-

examination of Dr. Barnard was that Petitioner might be feigning her IPV symptoms and that Dr.

Barnard choose not to consider sources that would contradict her diagnosis. Because Petitioner's

records simply offered additional support for Dr. Barnard's opinions of dissociation and PTSD

---

[8] Counsel provided Dr. Barnard with records related to the offense; the post-arrest interview; police reports related to the August 2008 domestic violence incident related to the victim; police reports related to the September 2005 domestic violence incident related to her then-boyfriend Melia; police reports related to the October 2005 domestic violence incident related to Schneider, her mother's boyfriend at that time; police reports related to the April 2005 altercation with Schneider; and police reports related to the December 2007 altercation with Vasquez-Lee. ECF No. 3-2 at 3–4.

and did not change her IPV diagnosis, ECF No. 3-2 at 13–15, the records would not have refuted the prosecution's theories that Petitioner was malingering and that Dr. Barnard was a biased witness because she deliberately declined to consider material that would challenge her conclusions.

Petitioner has not established that, if counsel had provided Dr. Barnard with all her records, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 689, 694. Petitioner is not entitled to relief on this habeas claim.

### d.   Blood Splatter Evidence

Petitioner argues that trial counsel was ineffective because she failed to present blood splatter evidence that would have undercut the prosecution's case for first degree murder. Petitioner raised this claim in her petition for a writ of habeas corpus, ECF No. 24-5 at 75–76, which was summarily denied by the California Supreme Court, ECF No. 24-5 at 2. With respect to this claim, trial counsel has submitted a declaration stating in relevant part:

> I retained a blood splatter expert, Dr. Robert D. Lawrence. I provided Dr. Lawrence with photographs from the crime scene, Mr. Mooney's autopsy report, police reports, and the transcribed interview of Sheyna. Dr. Lawrence informed me that the blood splatter evidence did not support Sheyna's representation that the stabbing occurred as she was lying in the closet floor. Dr. Lawrence opined that Mr. Mooney was initially stabbed while standing in the hallway near the bathroom. I did not call Dr. Lawrence because the prosecution was not calling a blood splatter expert and his findings did not support Sheyna's account of the stabbing.

ECF No. 3-4 at 6. Respondent argues that the decision to call an expert witness is a matter of trial tactics and a petitioner's disagreement with trial tactics cannot form the basis for a claim of ineffective assistance of counsel. Respondent further argues that the testimony would have impeached Petitioner's credibility because it conflicted with her version of where the stabbing took place, and because the question of where the attack commenced was not a critical aspect of the case against Petitioner. ECF No. 20-1 at 58–59. Petitioner argues that her credibility had already been undermined by photographic evidence presented at trial which suggested that the stabbing occurred on the bed, and not in the closet, as Petitioner claimed. ECF No. 31 at 40.

The Court agrees that the state court's denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the

Supreme Court of the United States. Nor did the denial result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Where the evidence does not warrant it, as is the case with the blood splatter evidence, the failure to call an expert does not amount to ineffective assistance of counsel. See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) (a decision not to pursue testimony by a psychiatric expert is not unreasonable when the evidence does not raise the possibility of a strong mental state defense). Counsel's decision to not call Dr. Lawrence deserves deference because (1) she based the decision on the strategic consideration that it would be more harmful than helpful because Dr. Lawrence's testimony could damage Petitioner's credibility because his version of events conflicted with Petitioner's version and because in providing a third theory as to when the victim was stabbed, the testimony did not strongly undercut the prosecution's version of events; (2) counsel's decision was informed and based upon investigation; and (3) the decision was reasonable under the circumstances, given that the prosecution challenged Petitioner's credibility, RT 1992–98, 2004–07 (cross-examining mental health expert as to whether Petitioner might be deliberately faking symptoms of IPV to bolster a self-defense theory) and 2484 (in closing argument, telling jury to believe the self-defense theory, you must believe the defendant who "has made all manners of inconsistent statements" regarding whether she reasonably believed she was in danger). See Sanders, 21 F.3d at 1456 (setting forth three elements to consider when deciding whether trial decision deserves deference). Moreover, presenting Dr. Lawrence would require presenting a conflicting defense theory. While Dr. Lawrence's potential testimony undercut the prosecutor's contention as to where the victim was stabbed, it also conflicted with the heart of Petitioner's self-defense theory – that she stabbed the victim in the closet because he had pinned her down and was choking her. Trial counsel has the discretion to abandon a conflicting defense. See Williams v. Woodford, 384 F.3d 567, 610–12 (9th Cir. 2004) (where counsel reasonably selected an alibi defense as the primary defense theory, counsel no longer had a duty to investigate a "conflicting" mental-state defense); Correll v. Stewart, 137 F.3d 1404, 1411 (9th Cir. 1998) ("it was within the broad range of professionally competent assistance for Correll's attorney to choose not to present psychiatric evidence which would have contradicted the primary defense

theory"); <u>Bean v. Calderon</u>, 163 F.3d 1073, 1082 (9th Cir. 1998) (attorney's duty to further investigate diminished capacity defense ended when he chose to present an alibi theory rather than a diminished capacity defense based largely on defendant's representations that he was not present during the crime, defendant's refusal to blame his alleged co-burglar, and defendant's refusal to adopt the diminished capacity defense). Petitioner has not establish that counsel's performance "amounted to incompetence under 'prevailing professional norms . . . .'" <u>Harrington</u>, 562 U.S. at 105 (citing <u>Strickland</u>, 466 U.S. at 690). Petitioner is not entitled to habeas relief on this claim.

### e. Failure to Object

Petitioner argues that trial counsel was ineffective when she failed to object to admission of an already barred stabbing incident. Petitioner raised this claim on direct review, and the state appellate court rejected Petitioner's claim as follows:

> Douprea next contends that her trial counsel provided ineffective assistance of counsel by failing to object when the prosecutor introduced evidence of an incident in which Douprea stabbed Schneider, which the court had ruled inadmissible before trial.
>
> *1. Background*
>
> Before trial, the prosecution had sought admission under section 1101, subdivision (b), of the April 11, 2006 incident involving Douprea and Schneider. In the proffer, it was alleged that Schneider made a derogatory remark to Gena, and Douprea responded by grabbing a knife and attempting to stab Schneider in the chest. To defend himself, Schneider raised his arm, which Douprea stabbed. Defense counsel opposed the admission of the evidence, and the court excluded it as inflammatory and unduly time-consuming.
>
> At trial, however, the prosecutor on direct examination of Schneider elicited evidence of this very incident, without objection from defense counsel: Schneider testified that Gena asked him to get her a cup of coffee and he made a derogatory comment; Douprea ran towards him, holding a knife at shoulder height in a fist; Schneider used his arm to block the knife from entering his chest, and the knife cut his arm, causing a wound that Schneider showed the jury. [FN 17] On cross-examination, Schneider acknowledged that he kicked Douprea, then pregnant, in the stomach as she approached: "I put my leg up and she ran into my foot."
>
>> FN 17: The prosecutor also elicited testimony from Patterson that he observed a wound about three inches long on Schneider's arm.
>
> Defense counsel also asked Gena about the incident. Gena testified that Schneider made the derogatory comment after she asked him to get her a cup of coffee, she heard his argument with Douprea, but she did not see what happened. Gena recalled that Douprea, who was eight months pregnant at the time, cried out in pain and later appeared with red marks on her stomach.

### 2. *Competence*

Douprea contends her trial counsel should have objected to the prosecutor's elicitation of this evidence – especially since the court had already ruled it inadmissible – and there can be no tactical reason for counsel's failure because, after all, counsel had originally sought to exclude it.

Respondent counters that Douprea has failed to demonstrate "there simply could be no satisfactory explanation" for her trial counsel's inaction. (*People v. Mendoza Tello* (1997) 15 Cal.4th 264, 266.) Respondent posits that the lack of objection by the defense does not appear to be an oversight, since the subject matter was raised in examinations and argument several times, counsel made other objections, and yet there was no mention by anyone of the court's prior ruling or any contention in Douprea's new trial motion that the elicitation of the evidence was erroneous. Further, respondent argues, the record does not preclude the possibility that the court changed its ruling prior to the elicitation of the evidence, either as relevant to intent under section 1101, subdivision (b), or to rebut evidence of Mooney's violent character under section 1103.

As Douprea points out, however, it would be unusual for such a ruling not to have been reported on the record, since the court on numerous occasions memorialized side bar discussions. Nor can we imagine any good reason defense counsel would ever agree to admission of the evidence without such an order (unless, perhaps, she decided to allow the evidence in order to show that Douprea acted in self-defense, as she suggested in closing argument). Thus, while this type of uncertainty in the record often leads courts to disfavor ineffective assistance claims on direct appeal, we proceed to the next issue of prejudice.

### 3. *Prejudice*

Douprea argues that the April 11, 2006 incident was uniquely harmful because it was the only prior instance in which Douprea used a knife to injure someone, for little or no reason, holding it the same way as she held the knife in stabbing Mooney. Furthermore, Douprea argues, the April 2006 stabbing was inflammatory and the prosecutor used the incident in closing argument to assert that Douprea had a propensity to commit domestic violence: "If she did it before, she did it here."

We conclude it is not reasonably probable that Douprea would have obtained a more favorable outcome if the defense had objected to the evidence of her cutting Schneider. The fact is, there was already evidence that she had threatened Schneider with a knife, holding it the same way as she held it when stabbing Mooney. And there was also plenty of evidence that she had caused physical harm to several other people on several occasions while enraged for little or no reason. Those other incidents might not have resulted in a scar, but there was on some occasions photographic proof of the injuries she had caused. Accordingly, this additional testimony simply did not add much to the mountain of evidence indicating Douprea's past violence, and in closing argument defense counsel was even able to suggest that Douprea's use of the knife against Schneider might have been out of self-defense (like her use of the knife against Mooney was supposedly out of self-defense). And although the prosecutor in closing argument did lump this incident in with the prior acts of domestic violence that could be used to show propensity under section 1109, the reference was so fleeting that the record discloses no reasonable possibility that the jury latched on to this point to convict Douprea in any way contrary to the court's instructions. Viewing the record as a whole, including all of the properly admitted evidence against her, Douprea fails to establish a ground for reversal.

Douprea, 2012 WL 5987896, at *22–*23.

Petitioner argues that the failure to object was below the standard of a reasonably competent attorney because the prior act evidence was overtly prejudicial; the objection would have been sustained; and there was no rational tactical reason for the failure to object. ECF No. 12 at 94–95. Petitioner further argues that the April 11, 2016 evidence was uniquely harmful because this prior incident mirrored the charged crime, in that Petitioner carried out the same act (stabbing) with the same weapon (knife), and because this evidence was emphasized in the prosecution's impermissible closing remarks urging the jury to use the incident as propensity evidence. Pet. at 96. Respondent contends that Petitioner cannot show that counsel erred on this record for the following reasons. The record shows that either the trial court had reconsidered its ruling excluding this evidence or trial counsel deliberately allowed the admission of the prior act evidence for tactical reasons; and the state court reasonably applied Strickland. ECF No. 20-1 at 62–63. Petitioner rejects these arguments as unsupported by the record and undervaluing the weight of the evidence. ECF No. 31 at 41–42.

Following the state court's lead, this Court focuses on the prejudice prong of Strickland. After carefully reviewing the record, the Court finds that the state court's denial of this claim was neither contrary to, nor involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. Nor did the denial result in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Petitioner has failed to establish that there is a substantial probability that, absent the admission of the April 11, 2006 incident, the jury would have had a reasonable doubt as to whether Petitioner was guilty of first-degree murder. Strickland, 466 U.S. at 694. "[T]he question [under § 2254(d)] is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Harrington, 562 U.S. at 105. As the state court noted, there was a "mountain" of properly admitted evidence indicating that, on several occasions when she was enraged for little or no reason, Petitioner had acted violently towards others and caused them physical harm. Douprea, 2012 WL 5987896, at *23; see also RT 1511–14 (Petitioner threw box at Melia, scratched Melia,

caused property damage); 1526 (Petitioner threw beer cans at Melia unprovoked); 1528 (Petitioner ripped Melia's shirt and scratched him, resulting in police visit and jail time); 1531 (Petitioner threw glass tumbler at Melia); 1532–40 (Petitioner attacked her mom and Schneider); 1609–11 (Petitioner struck and scratched Mooney and took his glasses off); 1710 (Petitioner hit Patterson with a closed fist while he was asleep because he refused to have sex with her); 1712–21 (Petitioner attacked Patterson and his roommate when they refused to allow her entry into their apartment). There was also properly admitted evidence that she had previously threatened others with a knife. CT 1544 (threatened Melia with a knife); 1720–21 (rushed at Patterson and his roommate with an open pocket knife in her hand). Based on the record before it, the state court reasonably concluded there was "no reasonable possibility" that admission of the April 11, 2016 incident was so prejudicial and inflammatory that the jury improperly relied upon this incident to convict Douprea in any way contrary to the court's instructions. The state court's denial of this claim was neither an unreasonable determination of the facts in light of the evidence presented at the state court proceedings; nor was it contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States. See, e.g., Featherstone v. Estelle, 948 F.2d 1497, 1507 (9th Cir. 1991) (finding no prejudice from trial counsel's failure to object to an improper closing argument because *inter alia* "[a] substantial amount of other independent evidence pointed squarely at [defendant's] guilt"). Petitioner is not entitled to habeas relief on this claim.

### 2. Due Process Claim

Petitioner argues that her right to a conviction based on proof less than a reasonable doubt was violated by section 1109 of the California Evidence Code and the use of CALCRIM No. 852. Petitioner raised this claim on direct review and the state appellate court rejected the claim as follows:

> Douprea contends that section 1109 is unconstitutional, because the admission of prior acts of domestic violence to prove a defendant's propensity to commit charged acts of domestic violence leads to a conviction based on proof less than beyond a reasonable doubt. She recognizes that our California Supreme Court "faced a similar issue when it upheld section 1108 against a Due Process challenge" in *Falsetta*, *supra*, 21 Cal.4th at p. 903, and that "numerous courts of appeal have found the Court's reasoning in *Falsetta* applicable to section 1109."

(*See, e.g., People v. Johnson* (2010) 185 Cal.App.4th 520, 529.)  She nonetheless argues that *Falsetta* is incorrect in its reliance on section 352 as a constitutional safeguard, and that its holding should not be extended to section 1109.  We are not persuaded that we should part ways with the cited precedent.

Douprea also contends that CALCRIM No. 852 is unconstitutional, arguing that it undercuts the presumption of innocence and the right to proof beyond a reasonable doubt, for reasons our Supreme Court rejected (as to section 1108) in People v. Loy (2011) 52 Cal.4th 46, 71–77, and People v. Reliford (2003) 29 Cal.4th 1007, 1013–1015 (Reliford)).  Douprea notes that California appellate courts have applied the reasoning in Reliford to section 1109 (see, e.g., People v. Reyes (2008) 160 Cal.App.4th 246, 251), but contends these cases were wrongly decided.  She fails to convince us that these precedents are in error, or that error occurred in this case.

Douprea, 2012 WL 5987896, at *24.

### a.        California Evidence Code 1109

Petitioner argues that Section 1109 offends a deeply ingrained Anglo-American jurisprudence that has categorically excluded other crimes evidence when offered to prove disposition; that the erroneous admission rendered her trial fundamentally unfair in violation of her due process rights.[9]  ECF No. 12 at 100–02.

After carefully reviewing the record, the Court finds that Petitioner is not entitled to habeas relief on this claim.  In determining whether to grant federal habeas relief pursuant to § 2254(d), historical Anglo-American jurisprudence is neither dispositive nor persuasive.  Rather, the question is whether the state court decision involved either contrary to, or an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.

The United States Supreme Court has never held that the introduction of propensity or other allegedly prejudicial evidence violates due process.  Rather, the Supreme Court has specifically left this question open.  See Estelle v. McGuire, 502 U.S. 62, 68–70, 75 n.5 (1991) ("we express no opinion on whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes" evidence to show propensity to commit a charged crime"); see also Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009) (Supreme Court "has not yet

_____

[9] Petitioner also argues that the state court's reliance on Falsetta in denying her due process claim was misplaced.  This argument fails to state a claim for federal habeas relief because it concerns a state court's application of state law.  Federal habeas relief does not for errors of state law.  Estelle, 502 U.S. at 67.

41

1   made a clear ruling that admission of irrelevant or overtly prejudicial evidence constitutes a due

2   process violation sufficient to warrant issuance of the writ").  Where the U.S. Supreme Court

3   "cases give no clear answer to the question presented, let alone one in [the petitioner's] favor, 'it

4   cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.' . . .

5   Under the explicit terms of § 2254(d)(1), therefore, relief is unauthorized." Wright v. Van Patten,

6   552 U.S. 120, 126 (2008) (alterations in original) (quoting Carey v. Musladin, 549 U.S. 70, 77

7   (2006), and 28 U.S.C. § 2254(d)(1)); see also Holley, 568 F.3d at 1101 (denying habeas relief

8   upon finding that trial court's admission of irrelevant pornographic materials was "fundamentally

9   unfair" under Ninth Circuit precedent but not contrary to, or an unreasonable application of,

10  clearly established Federal law under § 2254(d)); Alberni v. McDaniel, 458 F.3d 860, 865 (9th

11  Cir. 2006) (denying habeas relief on claim that due process was violated by admission of evidence

12  of defendant's past violent actions and explosive temper to show propensity due to Estelle's

13  reservation of the question whether propensity evidence violates due process).

14          Petitioner is not entitled to federal habeas relief on this claim.

15                  **b.      CALCRIM No. 852**

16          After carefully reviewing the record, the Court also finds that the state court's denial of

17  Petitioner's challenge to the constitutionality of CALCRIM 852 was not contrary to, nor did it

18  involve an unreasonable application of, clearly established Federal law, as determined by the

19  Supreme Court of the United States.

20          The Due Process Clause of the Fourteenth Amendment requires the prosecution to prove

21  every element charged in a criminal offense beyond a reasonable doubt.  In re Winship, 397 U.S.

22  358, 364 (1970).  Consequently, any jury instruction that lowers the level of proof necessary for

23  the prosecution to carry its burden "is plainly inconsistent with the constitutionally rooted

24  presumption of innocence." Cool v. United States, 409 U.S. 100, 104 (1972).

25          Plaintiff's claim that CALCRIM 852 impermissibly lowers the prosecution's burden of

26  proof is without merit.  CALCRIM 852 instructs the jury how to consider evidence that the

27  defendant committed domestic violence that was not charged in this case.  In relevant part,

28  CALCIRM 852 instructs:

> You may consider this evidence [of domestic violence that was not charged in this case] only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged domestic violence. Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt. A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.
>
> If the People have not met this burden of proof, you must disregard this evidence entirely. If you decide that the defendant committed the uncharged domestic violence, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit domestic violence and, based on that decision, also conclude that the defendant was likely to commit domestic violence and did commit murder as charged in Count I. If you conclude that the defendant committed the uncharged domestic violence, that conclusion is only one factor to consider along with all the other evidence. It is not sufficient by itself to prove that the defendant is guilty of murder as charged in Count I. The People must still prove the charge beyond a reasonable doubt.

CT 331–32. CALCRIM 852 does not require the jury to consider the prior domestic violence evidence, much less make a finding of guilt based upon such evidence. Instead, the jury was free to accept or reject such evidence. Even if the jury accepted prior domestic violence evidence as true, the jury was free to give this evidence any weight it chose. Second, the instruction does not lower the prosecution's burden of proof. The instruction explicitly stated that the prior acts evidence "is not sufficient by itself to prove that the defendant is guilty of" the charged offenses. The jury was also separately instructed that it had to be convinced of Petitioner's guilt beyond a reasonable doubt. RT 2429–30 ("Proof beyond a reasonable doubt is proof that leaves you with an abiding conviction that the charge is true. . . .Unless the evidence proves the defendant guilty beyond a reasonable doubt, she is entitled to an acquittal and you must find her not guilty."). The Court must presume jurors followed the instructions and applied the proper legal standard. See Weeks v. Angelone, 528 U.S. 225, 234 (2000). There is no "reasonable likelihood" that the jury applied the challenged instruction in a way that lowered the prosecution's burden of proof. See Estelle, 502 U.S. at 72; accord Beltran v. Warden, No. 14-CV-03027-JST (PR), 2015 WL 7874326, at *25 (N.D. Cal. Dec. 4, 2015) (citing cases holding that CALCRIM 852 did not impermissibly lower the prosecution's burden of proof). Petitioner is therefore not entitled to habeas relief on this claim.

### C.    Certificate of Appealability

The federal rules governing habeas cases brought by state prisoners require a district court that issues an order denying a habeas petition to either grant or deny therein a certificate of appealability.  See Rules Governing § 2254 Case, Rule 11(a).

A judge shall grant a certificate of appealability "only if the applicant has made a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(2), and the certificate must indicate which issues satisfy this standard.  Id. § 2253(c)(3).  "Where a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: [t]he petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Here, Petitioner has not made such a showing, and, accordingly, a certificate of appealability will be denied.

### III. CONCLUSION

For the reasons stated above, the petition for a writ of habeas corpus is DENIED, and a certificate of appealability is DENIED.

The Clerk shall enter judgment in favor of Respondent and close the file.

**IT IS SO ORDERED.**

Dated:   May 25, 2018

_____
JON S. TIGAR
United States District Judge